UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

ROCHELLE M. BRANDT,
personal representative of the
ESTATE OF GREGORY SHEAFFER,
*et al.*
    Plaintiffs

vs.

PRIMECARE MEDICAL, INC., *et al.*
    Defendants

CIVIL NO. 1:11-CV-1692

*M E M O R A N D U M*

*I.*    *Introduction*

    Presently before the court is a motion for partial summary judgment filed by Defendants, PrimeCare Medical, Inc. ("PrimeCare"), Susan Abele, and Marc Turgeon. This matter involves the suicide of Gregory Sheaffer, a pretrial detainee, at the Adams County Prison. PrimeCare provided medical services at the Adams County Prison. Defendants Abele and Turgeon provided medical care to Sheaffer prior to his death.[1] Sheaffer's estate filed the present action on September 8, 2011, bringing claims for deliberate indifference, medical malpractice, wrongful death, and a survival action.

---

[1] Defendants Abele and Turgeon are employees of PrimeCare.

*II.     Background*

On January 18, 2010, Sheaffer was taken to Gettysburg Hospital for an involuntary commitment assessment. Sheaffer was seen by Dr. Stefan Rosenbach, who indicated that Sheaffer presented with agitation and suicidal gesture. Dr. Rosenbach noted that Sheaffer communicated a history of schizophrenia and previous evaluations at Gettysburg Hospital.

While at the hospital, Sheaffer was arrested and taken to Adams County Prison.[2] When Sheaffer was processed, a Medical Booking Form was completed. The officer who completed the form noted that Sheaffer was taken to Gettysburg Hospital "for 302 but they wouldn't keep him." (Doc. 21-2). "302" refers to an involuntary commitment procedure under the Mental Health Procedures Act, which permits an involuntary commitment if an individual is a danger to himself or others. See 50 P.S. § 7302.

On January 19, 2010, Ruth Showers, L.P.N., conducted an initial intake screening, which includes a mental health history and initial suicide screening. Showers noted that Sheaffer explained that he had never attempted to commit suicide, did not presently feel suicidal, and had never been hospitalized or treated by a psychiatrist or mental health counselor. Sheaffer also told Showers that he did not have any medical conditions which required immediate treatment. Because Showers did not believe that he was at risk of suicide, Sheaffer was placed in a cell without suicide precautions.

---

[2] Defendants assert that Sheaffer was arrested and booked on January 19, 2010. Plaintiffs contend that he was arrested and booked on January 18, 2010.

2

On or about February 11, 2010, Sheaffer submitted two sick call requests to prison staff. The first stated the reason for the request as "for my sonness (sic) and nerves." (Doc. 21-4). The second stated the reason for the request as "bad thoughts suicide." (Doc. 21-4). In response to these requests, Sheaffer was placed in a "stripped cell," which provides suicide precautions, such as a suicide smock, tear away blanket, and the absence of a toilet and sink. A nurse at the prison, Kandace Carbaugh, submitted a referral for Sheaffer to the mental health department, which notes that Sheaffer had no prior mental health treatment, but he acknowledged writing the sick call requests. Carbaugh also noted that Sheaffer was placed in the stripped cell and would remain there until cleared by the mental health team.

Also on February 11, 2010, Defendant Abele, a social worker, performed a mental health assessment, during which Sheaffer expressed thoughts of suicide and claimed to speak to dead people. (Doc. 21, ¶ 34). Sheaffer told Abele that he was writing notes for ghosts about schizophrenia, bad thoughts, and suicide. He explained that he never intended to submit these "notes" as sick call requests. During the assessment Sheaffer asked to see the prison psychiatrist, to get something for his nerves. Abele recommended that Sheaffer see the psychiatrist and that he remain in the stripped cell.

The next day, Sheaffer was seen via video conference by Defendant Turgeon, a psychiatrist. Dr. Turgeon believes he spoke with Sheaffer for approximately 15-25 minutes. Dr. Turgeon described Sheaffer's demeanor as pleasant, cooperative,

and appropriate. When asked about the sick call request referring to "bad thoughts suicide," Sheaffer told Dr. Turgeon that he was writing what ghosts said to him. Sheaffer denied having been hospitalized for psychiatric reasons and explained that he had no history of suicide attempts. He also expressed that he had no intent to hurt himself. Dr. Turgeon diagnosed Sheaffer with an adjustment disorder and also considered a possible diagnosis of psychosis, a loss of touch with reality. After the conference, Dr. Turgeon recommended removing Sheaffer from the stripped cell and placing him on psych watch, which required officers to observe him in staggered intervals not to exceed fifteen minutes. He also recommended obtaining a mental health history from family members.

Sheaffer was then assigned to a cell with glass walls to make observation easier. On February 14, 2010, at 8:30 a.m., Sheaffer was reassigned to a cell with a sink and toilet. At 9:35 a.m., Nurse Carbaugh evaluated Sheaffer for complaints of chest pain. During that afternoon, Sheaffer knocked on his door and was told by prison staff that if he wanted to speak with someone, he could complete a medical slip and be seen by the medical staff the next day.[3] At about 3:50 p.m., Sheaffer hanged himself with a sheet. Sheaffer was taken to the hospital after attempts to revive him at the prison. He was pronounced dead on February 17, 2010.

---

[3] Plaintiffs submit that the officer also threatened to place Sheaffer in a "restraining chair" if he continued knocking on his door, and that this response was consistent with the training provided to him by PrimeCare. (Doc. 25, ¶ 21). Defendants admit that Sheaffer spoke with an officer and was instructed to fill out a slip if he wanted to speak with a medical professional. Defendants deny that the officer told Sheaffer he would be placed in a restraining chair or that such a response was consistent with his training.

On September 8, 2011, Rochelle Brandt, the personal representative of Sheaffer's estate, filed the instant action. Plaintiffs filed an amended complaint on February 1, 2012.[4] Count I of the amended complaint alleges that Defendants Abele and Turgeon acted with deliberate indifference when providing mental health care. Count II alleges that PrimeCare, the company providing healthcare for prisoners at Adams County Prison, failed to adopt adequate policies and procedures to prevent deliberate indifference by its employees. Counts III, IV, and V allege state law claims of medical malpractice and wrongful death. On April 29, 2013, Defendants filed a motion for summary judgment on Counts I and II, which has been fully briefed.

III.     *Standard of Review*

We will examine the motion for summary judgment under the well-established standard. Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d. Cir. 2008) ("Summary judgment is only appropriate if there are no genuine issues of material fact."). We "must view all evidence and draw all inferences in the light most favorable to the non-moving party" and we will only grant the motion "if no reasonable juror could find for the non-movant." Id. "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party.'" Roth v. Norfalco,

---

[4] Susan Sheaffer, Mercedes Sheaffer, and David Miraglia joined the amended complaint as Plaintiffs.

651 F.3d 367, 373 (3d Cir. 2011) (citing Lamont v. New Jersey, 637 F.3d 177, 181 (3d Cir. 2011).

*IV.     Discussion*

   *A. Inadequate Medical Treatment by Abele and Turgeon (Count I)*

Count I of Plaintiffs' amended complaint brings a claim pursuant to 42 U.S.C. § 1983, alleging that Defendants Abele and Turgeon provided inadequate medical treatment to Sheaffer, in violation of the Fourteenth Amendment.[5] To establish such a claim relating to the suicide of a pretrial detainee, the plaintiff must show: "(1) the detainee had a particular vulnerability to suicide (2) the [defendant] knew or should have known of that vulnerability, and (3) [the defendant] acted with reckless indifference to the detainee's particular vulnerability." Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991) (internal quotation marks omitted). Defendants argue that Plaintiffs have failed to demonstrate that Sheaffer had a particular vulnerability to suicide or that Defendants acted with deliberate indifference to his condition.

   *1. Particular Vulnerability to Suicide*

The first prong, a particular vulnerability to suicide requires, a "strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." Id. Upon Sheaffer's arrival at the prison on January 18, 2010, the booking officer noted that

---

[5] The Due Process Clause of the Fourteenth Amendment provides protection to pre-trial detainees. Sylvester v. City of Newark, 120 Fed. App'x 419, 423 (3d Cir. 2005) (nonprecedential).

Sheaffer was taken to Gettysburg Hospital "for 302 but they wouldn't keep him." (Doc. 21-2). On February 11, 2010, Sheaffer submitted a sick call request that indicated he was having "bad thoughts suicide." (Doc 21-4). Defendant Abele met with Sheaffer and indicated that he "had bad thoughts of suicide and sees and talks to dead people." (Doc. 21, ¶ 34). Following Abele's evaluation, she kept Sheaffer in a stripped cell with suicide precautions. We find that Plaintiffs have provided sufficient evidence that a reasonable jury may determine that Sheaffer had a particular vulnerability to suicide.

### 2. *Defendants' Knowledge of that Particular Vulnerability*

The second prong, requiring that defendants knew or should have known of the particular vulnerability, may be established "when they have had actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities." Colburn, 946 F.2d at 1025, n. 1. Both Defendants Abele and Turgeon were aware of the sick call request in which Sheaffer wrote "bad thoughts suicide." They both spoke with Sheaffer about the notes. Following Abele's evaluation, she chose to keep Sheaffer in a cell with suicide precautions. Under these circumstances, we find Plaintiffs have provided sufficient evidence to establish Defendants Abele and Turgeon knew or should have known of Sheaffer's particular vulnerability.

### 3. *Deliberate Indifference*

The final prong involves "a link between the prison official's knowledge and his disregard of the prisoner's particular risk." Vargo v. Plum Borough, 375 Fed. App'x

7

212, 216 (3d Cir. 2010) (nonprecedential).  The Third Circuit has suggested that this standard "is similar to the deliberate indifference standard applied to a claim brought under the Eighth Amendment, which requires the plaintiff to prove that the prison official 'know[s] of and disregard[s] an excessive risk to inmate health and safety.'" Id.  (citing Woloszyn v. County of Lawrence, 396 F.3d 314, 321 (3d Cir. 2005).  "[M]ere negligence on the part of prison officials is insufficient to establish a claim pursuant to § 1983." Kulp v. Veruete, 267 Fed. App'x 141, 143 (3d Cir. 2008).  When applying this standard in the context of health care issues, the Third Circuit has "recognized a distinction between corrections defendants and health care defendants." Donnell v. Corr. Health Servs., 405 Fed. App'x 617, 622 (3d Cir. 2010) (nonprecedential) (citing Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) and Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993)).

Sheaffer was placed in a stripped cell after writing the sick call notes, and after Abele performed a mental health assessment.  She continued the stripped cell designation until Dr. Turgeon could evaluate Sheaffer.  Dr. Turgeon met with Sheaffer the next day.  During the evaluation, Sheaffer explained that he was able to speak with ghosts.  Sheaffer asserted that he did not intend to turn in his sick call notes, and he was writing down what ghosts told him.  After determining that Sheaffer was not suicidal, Dr. Turgeon recommended that he be removed from the stripped cell and placed on psych watch.  Abele then placed Sheaffer in a "fish bowl" cell to make observation easier.  Two days later, Sheaffer was reassigned to a regular cell, but he remained on psych watch.  Plaintiffs have provided an expert report, which opines that Sheaffer was prematurely

removed from the stripped cell. We find that Plaintiff's have provided sufficient evidence from which a reasonable trier of fact could determine that Defendants Abele and Turgeon acted with deliberate indifference in their treatment of Sheaffer.

*B. Policies and Training by PrimeCare (Count II)*

Count II of the amended complaint alleges that PrimeCare's policies and practices caused the alleged constitutional violation. To hold PrimeCare liable under § 1983 for the actions of its employees, Plaintiffs "must provide evidence that there was a relevant [PrimeCare] policy or custom, and that the policy caused the constitutional violation they allege." Natale Camden County Corr. Facility, 318 F.3d 575, 583-84 (3d Cir. 2003). PrimeCare may be liable for failing to create a policy when "the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" Id. (quoting City of Canton v. Harris, 489 U.S. 378, 391, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)).

Plaintiffs' amended complaint refers to a number of PrimeCare policies and procedures which allegedly led to Sheaffer's death.[6] PrimeCare contends that Plaintiffs

---

[6] These include:
 1. Failure to instruct that suicidal inmates are seen timely by a psychiatrist or other appropriate provider;
 2. Failure to maintain proper policies and procedures for transfers into and out of "stripped cells";
 3. Failure to adequately train PrimeCare staff regarding the recognition of suicidal risk and the prevention of suicide;

9

have failed to provide evidence of a causal link between the decision by Dr. Turgeon to remove Sheaffer from a suicide cell and a PrimeCare policy or procedure.

### 1. Policies Identified by Plaintiffs

Plaintiffs cite the suicide prevention program as one of PrimeCare's policies. However, Plaintiffs' brief notes that "Primecare's written policies recognize the importance of suicide prevention in a jail population, [but] its actual practices at [the prison] undermined any meaningful application of sound principles in the case of Sheaffer." (Doc. 23, at 7-8). Plaintiffs seem to suggest that this policy is adequate on its face. For this reason, we find Plaintiffs have not provided sufficient evidence to establish how this policy caused the alleged constitutional violation.

Plaintiffs also object to the prison's psych watch policy. An inmate placed on psych watch is observed by officers in staggered intervals not to exceed fifteen minutes. Plaintiffs contend that this policy "permits mentally ill inmates to be isolated, without any mental health treatment or ongoing evaluation by a qualified mental health professional." (Doc. 23, at 7). Beyond this conclusory statement, Plaintiffs do not relate the policy to the present case. They do not argue that this policy contributed to

---

> 4. Failure to provide adequate staff for the provision of mental health treatment;
> 5. Failure to provide adequate psychiatric coverage;
> 6. Failure to provide prompt mental health treatment;
> 7. Failure to insure proper review of new inmates' medical history;
> 8. Failure to insure proper maintenance of "suicide watch" procedures; and
> 9. Failure to provide appropriate psychotropic medication on a timely basis.
>
> (Doc. 8, ¶¶ 41, 43).

Sheaffer's death, and we do not find any evidence in the record to support such a conclusion. Sheaffer was seen by mental health professionals on February 11 and 12, 2010. While on psych watch, he was observed by prison staff at staggered intervals. He was also informed by a prison staff member that if he wanted to speak with the medical staff, he could fill out a medical slip. Under these circumstances, we find that Plaintiffs have failed to demonstrate how the policy caused Sheaffer's death.

### 2. Lack of Policies

Plaintiffs argue that PrimeCare failed to establish any policy "delineating the appropriateness of seeking an inmate's authorization for release of medical records." (Doc. 23, at 7). Abele's deposition testimony reveals that if a prisoner discloses during booking that he has a history of mental health treatment, he is asked to sign a release form which authorizes the prison to obtain his mental health records. (Doc. 21-9, at 40-41). If the booking staff has been informed that the prisoner was recently transported to a hospital for an evaluation for an involuntary commitment, then the prisoner is sometimes asked to sign a release for those records. Id. In the present case, Sheaffer's booking sheet indicated that he was transported to Gettysburg Hospital for a "302," an evaluation for an involuntary commitment. When Sheaffer was evaluated by an intake nurse, he was not asked to sign a release for medical records. Although Sheaffer was not asked to sign a release, he was evaluated by Defendants Abele and Turgeon. They provided treatment with information obtained during their meetings with Sheaffer. We find that the absence of the policy submitted by Plaintiffs is not "so likely to result in the

11

violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need. Natale, 318 F.3d at 584 (internal quotation omitted).

### 3. Failure to Train

To establish a failure to train claim in a prison suicide case, a plaintiff must

> (1) identify specific training not provided that could reasonably be expected to prevent the suicide that occurred, and
> (2) must demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives.

Colburn, 946 F.2d at 1030. "The identified training deficiency must be 'closely related' to the ultimate injury, i.e., the plaintiff 'must . . . prove that the deficiency in training actually caused the deliberate indifference of municipal officers.'" Schuenemann v. United States, 2006 U.S. App. LEXIS 4350, 2006 WL 408404 (citing City of Canton, 489 U.S. at 391).

Plaintiffs assert that PrimeCare provided inadequate training to staff members at the prison. They cite the failure of the intake staff to identify the "302" referred to on Sheaffer's booking sheet as a reason to request that he sign a release for his medical history. Plaintiffs have not shown that this type of training could reasonably be expected to prevent Sheaffer's suicide. Plaintiffs assume, without providing evidence, that if Sheaffer had been asked to sign a medical release, he would have agreed, and his medical records would have affected the decision of Defendants Abele and Turgeon to remove Sheaffer from the stripped cell. Even if such training could be reasonably

12

expected to have prevented Sheaffer's suicide, Plaintiffs have not demonstrated that the risk reduction in providing this type of training is so great that the failure to provide it constitutes deliberate indifference to whether prisoners commit suicide.

Plaintiffs also argue that PrimeCare failed to properly train prison staff to appropriately respond to prisoners on psych watch. Specifically, Plaintiffs assert that the officer who instructed Sheaffer to complete a medical slip during the afternoon of his death was not properly trained. Plaintiffs contend, and Defendants deny, that this officer told Sheaffer that if he continued to knock on his cell door, he would be placed in a restraining chair. Although Plaintiffs cite this incident, they do not identify what type of training could have been provided to the officer, who is not an employee of PrimeCare, to prevent Sheaffer's suicide. Plaintiffs also do not make any argument that the risk reduction associated with any such training is so great that PrimeCare's failure to provide it constitutes deliberate indifference to the medical needs of inmates. For these reasons, we find that Plaintiffs' claim against PrimeCare fails.

*V.        Conclusion*

For the reasons set forth above, we will grant Defendants' motion for summary judgment on Count II of Plaintiffs' amended complaint. We will deny Defendants' motion for summary judgment on Count I.

We will issue an appropriate order.

/s/William W. Caldwell
William W. Caldwell
United States District Judge

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

ROCHELLE M. BRANDT, :
personal representative of the :
ESTATE OF GREGORY SHEAFFER, :
*et al.* : CIVIL NO. 1:11-CV-1692
    Plaintiffs :
:
vs. :
:
:
PRIMECARE MEDICAL, INC., *et al.* :
    Defendants :

*O R D E R*

AND NOW, this 24th day of July, 2013, upon consideration of Defendants' motion for summary judgment (doc. 19), and the response thereto, and pursuant to the accompanying Memorandum, it is ORDERED that:

> 1. Defendants' motion for summary judgment (doc. 19) is GRANTED in part and DENIED in part.
>
> 2. Defendants' motion for summary judgment on Count I of Plaintiffs' amended complaint is DENIED.
>
> 3. Defendants' motion for summary judgment on Count II of Plaintiffs' amended complaint is GRANTED.
>
> 4. This case is placed on the September 2013 trial term, scheduling order to follow.

                                      /s/ William W Caldwell
                                      William W. Caldwell
                                      United States District Judge